```
                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
                         WESTERN DIVISION
```

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 1:06-CR-00010 |
|  | : |  |
| v. | : |  |
|  | : | **ORDER** |
| ROBERT HORNE | : |  |
|  | : |  |

      This matter is before the Court on Defendant's Motion to Suppress (doc. 18) and the United States' Response (doc. 21). The Court held a hearing on such Motion on April 4, 2006. For the reasons indicated herein, the Court DENIES Defendant's motion.

**I. Background**

      This matter pertains to the warrantless stop of Defendant Robert Horne by Cincinnati Police Officers on October 7, 2005, which Defendant contends was not based on reasonable suspicion and therefore violated his Fourth Amendment right to be free of unreasonable search and seizure. Defendant seeks to suppress the firearm, a .38 caliber, Charter Arms revolver that contained five live rounds, another live round found in his left front pants pocket, and cocaine found on his person in a search incident to his booking.

      At the April 4, 2006 hearing, both Cincinnati Police Officer Thomas Weigand ("Weigand") and Defendant testified as to their respective versions of the events leading up to the arrest of Defendant. The testimony of the two witnesses differed dramatically, which ultimately forces the Court to make a

credibility determination concerning which witness offered reliable testimony.  Regrettably, the government did not offer up as a corroborating witness Cincinnati Police Officer Eric Schaible ("Schaible"), Weigand's partner.

## II.  Weigand's Version of the Events

According to Weigand, he and Schaible were patrolling their assigned District Four neighborhood, which he identified as a high-crime neighborhood with drug trafficking and violent crime. Shortly after 1:00 A.M., the officers approached 3501 Burnet Avenue, an apartment building Weigand testified they recognized for a high amount of activity in drug trafficking and weapons.  Weigand testified that the owner of that address had requested in writing that the Cincinnati Police assist in the enforcement of criminal trespassing laws.  Weigand saw a group of individuals standing in the breezeway to the building, and he opened his car window and called out to the group that they needed to move.  Two of the individuals left the breezeway and stepped away.  Weigand testified that he saw Defendant, who stayed in the breezway, hide behind a shorter female who also did not move in response to his instruction.  Because Defendant ducked down below the female, Weigand interpreted the movement as suspicious, and decided to investigate.  Weigand approached Defendant and asked Defendant whether he had "anything" on him.  According to Weigand, Defendant said, "No, you can check."  Having obtained consent, Weigand proceeded to pat-down Defendant.  When Weigand's hands approached Defendant's waist, Defendant suddenly collapsed to the ground.

Weigand's partner, Officer Shaible, assisted Weigand in bringing Defendant back to a standing position, but Defendant kept his knees bent.  Weigand continued his search of Defendant and felt a hard metal object in Defendant's waistband that he thought was a gun. Weigand then handcuffed Defendant, removed the gun and ammunition from Defendant's person, and secured the contraband in his police cruiser.  According to Weigand, Schaible proceeded to read Defendant his <u>Miranda</u> rights, out of the presence of Weigand. After being advised of his rights, Defendant stated that he bought the gun off the street for $40.00 for protection.

**III.  Defendant Horne's Version of the Events**

According to Horne, he was standing with his girlfriend alongside the apartment building where he was living with his girlfriend.  He stated that the address was 3101 Burnet Avenue, apartment eight, and that his girlfriend's name was Tisha Bradley. Horne stated that he had just ordered a pizza and went outside to meet the delivery person.  On his way downstairs to meet the delivery person, Horne said his cell phone rang and his mother called.  For this reason, Horne testified, he stayed outside after the delivery of the pizza, and waited with his girlfriend, who held the pizza, for his "ride" to come and take him to his mother's residence.

While waiting some two to three minutes, Horne testified, a Cincinnati Police cruiser suddenly pulled up, Officer Weigand exited and came directly at Horne and placed him in handcuffs. Horne testified that the officers did this without asking him any

questions. Horne denied making any furtive movements, and insisted that he was not in the breezeway of the building, but rather in front of the barbershop, a few steps away. Horne denied doubling over or collapsing. Horne testified that he did not understand why the police were targeting him when he had not committed a crime. Horne further testified that he was not read his Miranda rights, and that he did not remember making any statements about the gun found on his person.

**IV. Cross Examination of Witnesses**

Upon cross examination, Officer Weigand stated that he did not ask any of the individuals in the group for identification, did not know if the individuals were trespassing or legitimately on the premises, and did not remember asking Defendant about any medical condition after he crumpled to the ground. Weigand stated that he had asked Defendant to step down from the breezeway in order to question him. Weigand indicated that he did not know for certain what Defendant was wearing, but he thought Defendant was wearing sweatpants, or in any event some sort of pants with a drawstring or elastic waistband. Weigand affirmed that he thought Defendant made the statement about spending $40.00 on the gun while confined in the police cruiser.

Defendant Horne stated emphatically on cross examination that his name "was on the paperwork," for an apartment at 3101 Burnet Avenue apartment eight, along with his girlfriend, Tisha Bradley. The United States indicated to Defendant that the address of the building was at 3501 Burnet Avenue, and that the list of

4

tenants in the building shows Ms. Bradley resided in apartment 17. Defendant argued that Ms. Bradley stayed in apartment 17 before they "got together." The United States asked Horne why he went downstairs to fetch a pizza with a gun on his person, and crack cocaine in his shoe and shirt. Horne stated he kept the gun on his person for protection, and "I did not take no crack down with me to get no pizza." Horne indicated his Mother worked second shift, and so it was entirely reasonable to take her pizza at 1:00 A.M.

The United States then played a videotape from the evening showing Defendant in the back of the cruiser after his arrest. In the videotape, the officers calmly asked Defendant questions about his residence and his birthplace, and Defendant calmly responded. Defendant stated to the officers that he purchased the gun from a guy for $40.00, but also stated that he had no job. After the videotape, Defendant stated he had a job with Allied Moving Company, but that he was paid under the table. The United States questioned the fact that Defendant had a clear memory about ordering a pizza and talking with his Mother on the cell phone, but could not remember making any statements about the gun, which he clearly had made.

**V. The Fourth Amendment**

Governmental detentions of persons, including arrests, constitute seizures, and as such must be reasonable under the Fourth Amendment. Similarly, evidentiary searches and seizures must be reasonable to be valid under the Fourth Amendment.

There are essentially three types of encounters that can

5

occur between a citizen and a police officer: a consensual encounter, an investigative Terry-type stop, and an arrest. See United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989). A consensual encounter can occur without any suspicion or justification, while an arrest can take place only if the police have probable cause to believe the individual has committed or is committing a crime. Beck v. Ohio, 379 U.S. 89 (1964). The investigative stop falls on the continuum between these two, and allows for police to briefly detain a person for investigative purposes even if they lack probable cause to make an arrest. Terry v. Ohio, 392 U.S. 1 (1968).

In Terry, the officer observed two individuals pacing back and forth in front of a store, peering into the window, and periodically conferring. 392 U.S. at 5-6. The conduct observed was lawful, but it also suggested the individuals were casing the store for a planned robbery. The Terry decision recognized that the officer could detain the individuals to resolve the ambiguity. 392 U.S. at 30.

To make an investigative stop, police must have reasonable suspicion supported by articulable facts that criminal activity may be afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989). If the police also have a reasonable suspicion to believe that the detainee is armed and dangerous, they may also conduct a "frisk," a limited search, to ensure the detainee has no weapons. Terry, 392 U.S. at 24, Adams v. Williams, 407 U.S. 143, 146 (1972).

In reviewing the legality of Terry stops, courts must

6

consider the "totality of the circumstances" of each case, so as to determine whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002). Relevant to the totality of the circumstances are various factors, such as whether the stop occurred in a high-crime area, Illinois v. Wardlow, 528 U.S. 119, 124 (2000), or whether the suspect engaged in evasive behavior or acted nervously, Id., United States v. Brigoni-Ponce, 422 U.S. 873, 885(1975), United States v. Sokolow, 490 U.S. 1, 8-9 (1989).

A determination whether reasonable suspicion exists must give due weight to common sense judgments reached by officers in light of their experience and training. Arvizu, 534 U.S. 266, 273 (2002)(officers draw on their experience and training to make inferences from and deductions about cumulative information available to them), United States v. Carthorn, No. 93-6593, 1994 U.S. App. LEXIS 24582, *15 (6th Cir. September 8, 1994) (per curiam)(finding reasonable suspicion based on Defendant's presence in the back seat of a car in a known drug area at 4:00 A.M. and due to the fact that the officer had made previous arrests at the same location), United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2003)(noting that the officer's familiarity with the high crime and drug trafficking nature of the neighborhood were important factors in the reasonable suspicion analysis).

In permitting such detentions, the law accepts the risk that officers may stop the innocent. Wardlow, 528 U.S. at 126. "Indeed the Fourth Amendment accepts that risk in connection with

7

more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent," states the Wardlow court, "The Terry stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further." Id.

To be reasonable under the Fourth Amendment, most searches must be pursuant to a warrant. However, there are a number of exceptions, including those under the "plain view" and "plain feel" doctrines. In Minnesota v. Dickerson, 508 U.S. 366, 375 (1993), the Supreme Court expanded the plain view doctrine to tactile discoveries. The plain view doctrine allows for the seizure of evidence whose incriminating character is immediately apparent when the officers have a lawful right of access to the object. Horton v. California, 469 U.S. 128, 136-37 (1990). In Dickerson, the high Court found that where an officer "lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context." 508 U.S. at 375-376. Police may also conduct a warrantless search incident to a lawful arrest. Chimel v. California, 395 U.S. 752, 763 (1969), United States v. Robinson, 414 U.S. 218 (1973).

**VI. Discussion**

The Court must weigh a number of issues when making a

credibility determination of a witness, including the witness's interest in the outcome of the case, his or her candor, and the extent to which he or she has been supported or contradicted by other credible evidence. Courts have also weighed such factors as a witness's state of mind, strength of memory, and demeanor and manner on the witness stand. Valdez v. Church's Fried Chicken, Inc., 683 F. Supp 596, 606 (W.D. Texas, 1988)(citing Heelan v. Johns-Manville Corp., 451 F. Supp. 1382, 1385 (D. Colo. 1978)). In this case, the balance weighs clearly in the favor of accepting Officer Weigand's version of the events as true. Although Defendant attempted to impeach Weigand's testimony for his lack of certainty about Defendant's clothing, the Court actually found that in such instance, Weigand's lack of certainty showed that the Officer was careful in ensuring his sworn statements were accurate. Weigand clearly showed a strong memory about pulling up to the building, warning the group in the breezeway to disperse, and noting suspicious behavior on the part of Defendant.

In contrast, Defendant failed to remember what, if anything, he said to the police about purchasing the gun and incorrectly cited the street address of the building where he claimed to be residing. Defendant further denied on the stand that he had any crack cocaine on his person when he descended to meet the pizza delivery man, something which is clearly contradicted by the record evidence. Police found crack on Defendant's person during a search incident to his booking (doc. 21).

Although the government failed to provide a corroborating

9

witness, Officer Schaible, Defendant failed to even a greater extent: his mother did not corroborate the cell phone call; his "ride" did not corroborate that he was on his way to give Defendant a lift; and none of the females in the group with him, namely his ex-girlfriend Tisha Bradley, testified as to his version of the events. Clearly, taking these facts into consideration, combined with the interest of Defendant in the outcome of this case, the Court is compelled to reject Defendant's version of the events, and to accept the version of Officer Weigand. It does not ring true that the Officers randomly pulled up to Defendant and arbitrarily handcuffed him without questions or any suspicion.

Defendant's counsel argued at the hearing that even accepting Weigand's version of the events as true, there still was insufficient justification for a Terry stop of Defendant. The Court disagrees. According to Weigand, the area is a hot spot for drug and gun activity, it was late at night, and Defendant acted strangely by ducking behind one of the females in the breezeway. Weigand was therefore justified under the totality of the circumstances to conduct a Terry investigation. Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Defendant agreed to permit a search of his person, and entered no credible evidence into the record showing he was coerced to permit such search. In any event, Officer Weigand was not unreasonable in conducting a pat-down of Defendant in light of the area, the time of day, and the demeanor of Defendant. Terry, 392 U.S. at 24. Under the plain feel doctrine, Weigand discovered the gun, and such evidence is properly

admissible against Defendant.   <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 375 (1993).

**IV. Conclusion**

    For the reasons indicated herein, the Court does not find well-taken Defendant's arguments in support of his motion. Accordingly, the Court DENIES Defendant's Motion to Suppress (doc. 18).

    SO ORDERED.

Dated: April 5, 2006        <u>s/S. Arthur Spiegel        </u>
                                      S. Arthur Spiegel
                                      United States Senior District Judge